No. 33,440

HUMBERT RIDDLE, *Appellant,* v. H. N. RANKIN (*Defendant*) and THE MARYLAND CASUALTY COMPANY, *Appellee.*

(69 P. 2d 722)

Opinion filed July 10, 1937.

*J. E. Addington* and *Howard A. Jones,* both of Topeka, for the appellant.

*Ralph T. O'Neill, John D. M. Hamilton* and *Barton E. Griffith,* all of Topeka, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was a hearing on exceptions to the answer of a garnishee. The trial court made findings of fact and rendered judgment for the garnishee. Plaintiff, the garnisher, has appealed.

The facts, summarized or quoted from the findings of fact made by the trial court, may be stated as follows: The defendant Rankin operated a riding stable, where he let riding horses for hire. On March 18, 1933, plaintiff, riding a horse hired from Rankin, sustained personal injuries, for which he sued Rankin and recovered a judgment for $2,851.25. Execution was issued against Rankin on this judgment and returned unsatisfied. Plaintiff then had a garnishment summons issued to the Maryland Casualty Company, which filed an answer of nonliability. Plaintiff elected in writing to take issue on the answer. This is the issue tried by the court below. The court found that in 1932 Rankin operated a business known as the Rankin Riding Stables; that Everett L. Herren and his son conducted an insurance agency, and that Glenn D. Hussey and others were conducting a separate insurance agency and were the general agents of the garnishee, the Maryland Casualty Company; that about August 24, 1932, at Herren's solicitation, he was authorized

by Rankin to secure for him policies of insurance, one of which was to be against liability to patrons of the riding stables. Herren & Son were not agents for the Maryland Casualty Company, nor were they agents for any company writing the kind of insurance desired by Rankin. Herren requested the Hussey agency to write the policy, which it did, in the Maryland Casualty Company, and delivered the policy to Herren, and he delivered it to Rankin and collected from Rankin the premium thereon for one year. At the time he did this Herren was acting as the agent and by the authority of the Maryland Casualty Company. Two policies were written, one of which indemnified against damages such as plaintiff sustained, and it is with this one we are principally concerned. Herren failed to pay the premium to the Hussey agency, but that agency, under its agency agreement, paid the net premium on the policy for one year to the Maryland Casualty Company, which company retained the premium. Neither Hussey nor the Maryland Casualty Company knew Herren had collected the premium from Rankin. On October 3, October 23 and November 13, 1932, patrons of Rankin sustained injuries for which they claimed damages. These accidents were reported to the Maryland Casualty Company, but none of them had been adjusted by the last week of December, 1932. Early in October, about the middle of November, and again about the middle of December, 1932, Hussey had called upon Herren to pay the premiums on the Rankin policy, but Herren did not pay—said he would get in touch with Rankin and get the money. The last week in December, 1932, "Hussey, over the phone, told Herren that if he, Hussey, did not have the money for the premiums that day or the next, he would cancel the policies by registered mail, and Herren said, 'Don't do that. I am taking on another company and I will bring them to you.'" Following this telephone conversation Herren went to Rankin "and stated to him, in substance, that the Maryland Casualty Company did not pay claims against it promptly; that he had had trouble with them about paying claims and that it was 'not worth a damn.' He further stated to Rankin that if he, Rankin, wanted someone to take care of him that he, Herren, would put him in a good company. Because of relying upon these statements of Herren, H. N. Rankin delivered to Everett L. Herren the two Maryland Casualty Company policies and thereafter Herren delivered them to the Hussey Insurance Agency . . . they were marked canceled for nonpayment of premiums by that agency on December

31, 1932," and were forwarded through the Kansas City branch office to the home office of the Maryland Casualty Company at Baltimore, Md. About February 14, 1933, one Blackman, an auditor of the Maryland Casualty Company, came to Topeka to procure data to enable him to compute and audit the earned premium on the policies from the date they were issued to Rankin to December 31, 1932. As to the policy here involved, that depended on the number of riding horses Rankin kept at his stables. Blackman called Rankin by telephone and inquired and learned about the number of horses he kept. He then computed the earned premium on the two policies to be $34.99 and the unearned premium to be $69.91. There is no finding that Blackman told Rankin why he was inquiring about the number of horses, nor that he informed Rankin what he was computing, or the result of the computation. We were told at the argument that he did not inform Rankin of those matters. At the time Herren received the two Maryland Casualty Company policies from Rankin, Herren & Son were agents for the Public Indemnity Company, and on January 3, 1933, wrote, issued and delivered to Rankin a policy in that company covering liability for accidents to patrons of the Rankin Riding Stables. It was agreed between Rankin and Herren that Rankin was to pay nothing to the Public Indemnity Company nor to Herren for this policy, but that the premium thereon was to be paid out of the money Herren had received from Rankin as premium for the Maryland Casualty Company policies. Herren never billed Rankin for the premium on this policy, "nor did H. N. Rankin pay any premium to Herren & Son for or on account of said Public Indemnity Company policies. The premium due on said policies to the Public Indemnity Company was by the company charged to the account of Herren & Son." There is no finding that Herren paid the Public Indemnity Company the premium on this policy.

Plaintiff sustained injury on March 18, 1933, for which he recovered judgment. The Maryland Casualty Company was notified of that injury May 31, 1933. The Maryland Casualty Company has at all times denied any liability upon the policies it issued to Rankin after their cancellation on December 31, 1932, and refused to participate or take any part in connection with the accident to plaintiff and the litigation subsequently ensuing, out of which the judgment for plaintiff was rendered. "No demand for payment of premium was made upon H. N. Rankin by the garnishee or the

Hussey Insurance Agency and no notice of cancellation was ever given by the Maryland Casualty Company to the defendant H. N. Rankin. At the time H. N. Rankin delivered to E. L. Herren the two Maryland Casualty Company policies in December, 1932, he did not know that the premium thereon had not been remitted by said Herren to the Maryland Casualty Company. That the Hussey Insurance Agency accepted other insurance risks from the said Herren & Son Insurance Agency and issued policies to cover the same, and carried an account on its books against the Herren & Son Insurance Agency."

On the day plaintiff Riddle received his injury, or the next, Rankin reported the accident to Herren, who called Orville A. Sheffler, who was an adjuster at that time for the Public Indemnity Company. Sheffler went to Herren's office, checked the insurance coverage from Herren's record, and found it to be the Public Indemnity Company, and requested Rankin to come to his office to make a further report. About the following day Rankin went to Sheffler's office and there made a detailed report of the accident and signed a written statement prepared by Sheffler. At that time "Rankin stated, in substance, that he guessed his type of insurance was difficult to get; that he had been insured in the Maryland Casualty Company but that said company had canceled his policies and for that reason Everett L. Herren had placed his insurance in the Public Indemnity Company.

"By his delivery to E. L. Herren of the Maryland Casualty Company policies and the acceptance of the Public Indemnity Company policies it was the intention of H. N. Rankin to surrender the Maryland Casualty Company policies and any rights thereunder and thereafter to have his liability insurance on his riding stables carried by the Public Indemnity Company. . . .

"Rankin never received any compensation from the Public Indemnity Company for the damages sued for in this action, said Public Indemnity Company and its reinsuring company having taken bankruptcy."

The trial court made conclusions of law as follows:

"1. In procuring the issuance of the policy involved, Everett L. Herren was acting as an insurance broker.

"2. In the receipt of the policies from the Hussey agency and in delivering the policies to the defendant, Everett L. Herren was the agent of the garnishee, the Maryland Casualty Company.

"3. The payment of the premium to Everett L. Herren was payment to the garnishee, the Maryland Casualty Company.

"4. The premium having been paid to the garnishee, the Maryland Casualty Company, it had no legal right to cancel the policy for nonpayment of premium.

"5. That Harold N. Rankin had actual knowledge of the surrender of the Maryland Casualty Company policies for cancellation and of the execution of the Public Indemnity Company policies therefor and that he ratified in all respects the acts of Everett L. Herren in the surrender of the Maryland Casualty Company policies and the issuance of the Public Indemnity Company policies in lieu thereof.

"6. That the Maryland Casualty Company policies were surrendered and canceled by mutual consent and agreement of the parties as of December 31, 1932, and that by reason of such surrender and cancellation said policies were not in force and effect after said date, and by reason thereof the garnishee is not liable under said policies to pay the amount of plaintiff's judgment and costs herein.

"7. That the garnishee is indebted to the defendant in the sum of $69.91 unearned premium on the two policies of the Maryland Casualty Company, for which amount the plaintiff should have judgment against the garnishee."

In this court appellant does not complain about the findings of fact, nor does he complain about conclusions of law Nos. 1, 2, 3 and 4. The argument, from many viewpoints, is centered largely about conclusions of law Nos. 5 and 6. There is something of a *non sequitur* about conclusion of law No. 7 which neither party is altogether satisfied with, or is able to explain very clearly. But we shall need to deal with it incidentally only.

Appellant complains of conclusion of law No. 6, "That the Maryland Casualty Company policies were surrendered and canceled by mutual consent and agreement of the parties." The remainder of this conclusion consists of results which naturally would follow if that part of the conclusion is sound. Appellee concedes the policies were not canceled under any of the terms of the policies, and makes no complaint of conclusion of law No. 4 to the effect it had no legal right to cause the policies to be canceled for nonpayment of premium. This conclusion is founded on our statute G. S. 1935, 40-247, which, briefly stated, provides that an insurance broker or agent who collects the premium from the insured on a policy which he is instrumental in having written holds such premium in trust for the insurance company which issued the policy, and his failure to account to the insurer for the premium prima facie is larceny, for which he may be prosecuted and convicted. So, when these policies were delivered to Rankin, and he paid the premium thereon to Herren, who was found and is conceded to have been a broker in this transaction, the money paid for the premium belonged to the Mary-

land Casualty Company, the insurer, and Herren held it in trust for the insurer. Having thus received the premium, the insurer was not entitled to collect it again from Rankin (*Ocean Accident & G. Corp. v. Emporia Tele. Co.*, 139 Kan. 106, 29 P. 2d 1084); neither was it entitled to cancel the policies for nonpayment of premiums. Since the Maryland Casualty Company had no right or authority in law to cancel the policies for nonpayment of premium it necessarily follows that the act of the insurance company in canceling the policies for that reason is void and of no effect.

Obviously, the statute G. S. 1935, 40-247, is designed for the benefit of an insured who pays the premium on the policy to the broker or agent of the insurer and to protect him in his rights under the policy of insurance irrespective of defalcations of the broker or agent respecting his payment to the insurer. Under the statute the insurer is given a greater remedy to collect from the broker or agent who has collected from the insured than is given ordinarily by statute for the collection of an ordinary account. Such broker or agent who fails to account to the insurer is prima facie guilty of larceny and may be prosecuted therefor. This statute necessarily places a duty upon the insurer to ascertain whether the insured paid the premium to the broker or agent before it attempts to cancel the policy for nonpayment of premium. Neither the Maryland Casualty Company nor its general agent, the Hussey Insurance Company, attempted to ascertain from Rankin whether he had paid the premium to Herren. We think that should have been done before the policy was canceled for nonpayment of premium, or any threat or attempt to do so was made. The insurer and its general agent were bound to know that under the law payment of premium by Rankin to Herren was payment to the insurer. It is not enough for the insurer to say it "did not know" Rankin had paid the premium to Herren. It was the insurer's business to find out if that had been done, not only because the statute inferentially requires it, but because it is a fact which affected the validity of the policy. Perhaps that could have been done as easily as the auditor, Blackman, learned from Rankin the number of horses he kept at his stables. Perhaps the Hussey Insurance Agency assumed Rankin had paid Herren, for it charged the item to Herren on its books of account. It never charged the premium to Rankin, nor attempted to collect it from Rankin. It was satisfied to extend credit for the time being, at least, to Herren for the amount of the premium, and continued to

write other policies on Herren's request, and charge the premiums thereon to him on account. This statute was designed to protect an insured in his policy under circumstances such as here presented, or any circumstance when the broker or agent makes default in accounting for the premium collected from the insured.

With these views in mind let us approach the correctness of the court's conclusion of law, that the policies "were surrendered and canceled by mutual consent and agreement of the parties." Contracts of insurance may be canceled by mutual consent. (32 C. J. 1243.) The rules governing such cancellation are the same or similar to rules governing the cancellation by mutual consent of other contracts, and are similar to those for the making of a contract. To effect a valid cancellation of a contract of insurance by mutual consent the minds of the parties should meet in agreement. Fraud practiced by one of the parties which induces the other to agree to the cancellation of the policy constitutes grounds for voiding the agreement. (32 C. J. 1245; 6 Couch's Cyclopedia of Insurance Law, 5025, 5028, 5065.) No one contends that Rankin agreed his policies should be canceled for nonpayment of premium. On this point, which is the only one the insurer had in mind when it canceled the policies, the minds of the parties never met. On behalf of appellee it is argued that the parties agreed to the cancellation of the policies; that the fact that the insurer had in mind one reason for making the agreement and the insured was prompted to act for a different reason does not prevent the minds of the parties meeting on the fact of cancellation. We pass this thought for a moment. Where one of the parties, ignorant of the facts and of his rights, is induced by fraud to consent to the cancellation of his insurance policy, the cancellation is ineffectual. (32 C. J. 1245.) Here Rankin, under the facts found by the court, was induced to let Herren have the policies for cancellation because of and relying upon Herren's false and fraudulent representations, not knowing at the time that Herren had not accounted to the insurer for the premiums, and not knowing his rights under the policies in the situation which existed. Herren's acts are not excused or condoned by counsel on either side in this case; neither will they be excused or condoned by this court. In effect it is conceded that Herren's conduct was reprehensible; that he falsely concealed from Rankin the fact that he had not accounted to the insurer for the premium on the policies, made false representations as to the business practices and the solvency of the in-

surer, and falsely represented he could place the policy in a good company; and that it was because of these false and fraudulent representations, upon which Rankin relied, that the policies were surrendered for cancellation.

On this point appellee contends it is in no way responsible for the false and fraudulent representations of Herren, and at the time he made such representations he was not the agent of the insurer. It concedes Herren was its agent for the purpose of delivering the policies and collecting the premiums thereon, but contends the agency ceased when the premiums were collected. Some phases of the status of a broker as agent for one party or the other are treated in *Rosedale Securities Co. v. Home Ins. Co.*, 120 Kan. 415, 243 Pac. 1023, and *Ocean Accident & G. Corp. v. Emporia Tele. Co.*, 139 Kan. 106, 29 P. 2d 1084, and the cases cited therein. An insurance broker may, for a particular thing, be the agent of the insured or of the insurer, or of both, depending upon the thing he is doing, and usually depending on which party requested or employed him to do the particular thing. (See cases above cited; also, 9 C. J. 509 and cases cited, and 32 C. J. 1052 *et seq.*) Here Herren was the agent of Rankin for the purpose of finding a company to write the kind of policies Rankin wanted, and perhaps for making application therefor. (*Rosedale Securities Co. v. Home Ins. Co.*, supra.) But when he did this his agency for Rankin terminated. When the policies were written and handed to Herren for delivery he became the agent of the insurer for the purpose of delivering the policies and collecting the premiums thereon. (*Ocean Accident & G. Corp. v. Emporia Tele. Co.*, supra.) It was a part of his duties as agent for the insurer to account to the insurer for the premiums collected. This he never did; hence, he never completed the task assigned to him as agent for the insurer, and under the statute (G. S. 1935, 40-247) he held the premiums in trust for the insurer. So, it cannot be said that he had completed the business for which the insurer had made him its agent. With this status pending, Mr. Hussey called Herren and told him if the premium was not in his office that day or the next the policies would be canceled by registered mail. They were dealing still with the unfinished business about premiums, for the collection of which Herren was agent of the insurer, and it was the general agent of the insurer talking to Herren. Herren replied: "Don't do that. I am taking on another company and I will bring them [the policies] to you." Mr. Hussey's response is not shown in

the court's findings, perhaps not in the evidence. It is obvious, however, the plan suggested by Herren to collect or adjust the premiums on the policies issued to Rankin was satisfactory to the Hussey Insurance Agency, since it made no protest, and it took the policies when Herren brought them in. Certainly, when Herren went to Rankin to get the policies he was not acting as the agent of Rankin. Herren went to get the policies in harmony with a plan he had suggested, and which had been acquiesced in by the Hussey Insurance Agency, of completing, in part at least, his duty as an agent of the insurer, to deliver the policies and to collect and account for the premiums. His going there was tantamount to his going upon a request or direction of the Hussey Insurance Agency, the general agent of the insurer, to get the premiums in its office, or the policies. We think Herren was still the agent of the insurer when he went to Rankin to get the policies. The insurer, through its general agent, did a wrong to Rankin in sending or permitting Herren to go to Rankin for the policies. They should have known that Rankin had paid the premium to its agent Herren. That not only would have been good business and fair dealing with the insured, which he was entitled to have from the insurer, but it would have been in harmony with the duty indirectly imposed upon it by statute. (G. S. 1935, 40-247.)

Appellee specifically complains of the false representations respecting the insurer made by Herren to Rankin, and says he could not possibly have been the agent of the insurer when he was making such representations. Of course what Herren did about that was wrong, subject to severe condemnation. In fact, everything he did in his interview with Rankin on that occasion was wrong. His going there to get the policies was wrong, and it was wrong for the insurer's general agent to permit him to go there to get the policies. All of this was not only wrong, but in a sense was fraudulent. Since Herren was still the agent of the insurer, and since he went there to get these policies, with the knowledge and acquiescence of the insurer's general agent, the question of whether he told one false story or another is not so very material. Apparently he told the one which occurred to him as being effective to enable him to get those policies, a thing which the insurer, through its general agent, was not averse to having done. Hence, the fact that he told falsehoods about the insurer is not materially different than if he had told some other falsehood which would have accomplished the same purpose.

Appellant complains of conclusion of law No. 5. The first part of it, that Rankin had actual knowledge of the surrender of the Maryland Casualty Company policies for cancellation, and of the execution of the Public Indemnity Company policies therefor, is not seriously objected to, except that it should be noted all the knowledge Rankin had respecting the surrender of the Maryland Casualty Company policies came from Herren; he learned nothing about that directly from the insurer or its general agent. In fact, the surrender of the Maryland Casualty Company policies was the object to be obtained by the fraud practiced on Rankin by Herren. This part of the conclusion of law is similar to one of the court's findings to the effect that when Rankin delivered to Herren the Maryland Casualty Company policies and accepted the Public Indemnity Company policies it was Rankin's intention to surrender the Maryland Casualty Company policies. Naturally, that was his intention, produced by the fraud of Herren, relied upon by Rankin, and was the real design to be accomplished by Herren's fraud. The part of conclusion No. 5 specifically objected to by appellant reads:

". . . That he [Rankin] ratified in all respects the acts of Everett L. Herren in the surrender of the Maryland Casualty Company policies and the issuance of the Public Indemnity Company policies in lieu thereof."

It would be a fruitless thing for the courts to denounce fraud, even to go so far as to formulate and apply the maxim, "Fraud vitiates everything it touches," and then to say that because one does the thing fraud practiced upon him was designed to have him do that he has thereby ratified the fraud. We decline to give our approval to such a conclusion. The authorities are against that view. In *Baker v. Insurance Co.*, 112 Kan. 530, 212 Pac. 118, it was held:

"An invalid or defective cancellation by the insurer will not become effective by ratification when the act of the insured relied upon is induced by his ignorance of the facts or of his rights, or by false representation of the insurer's agent." (Syl. ¶ 3.)

Here Rankin was ignorant of the fact that Herren had not accounted to the insurer for the premiums; of the fact that the general agent of the insurer was threatening to cancel his policies for nonpayment of premiums; of the facts respecting the insurer's solvency, and of the fact that Herren, with the acquiescence and approval of the insurer's general agent, had come to him to get the policies for cancellation for nonpayment of premiums which had been paid and which, under the law, had been received by the insurer. Also under this record it is fair to say he was ignorant of his rights in the

premises. Unquestionably his delivery of the Maryland Casualty Company policies and his acceptance of, or agreement to accept, the Public Indemnity policies, were brought about and induced by the fraudulent representations of Herren, who, as we have heretofore seen, was still the agent of the insurer.

One of the essentials of ratification is a full knowledge on the part of the insured of the acts of the agent and its effect upon his rights. Other authorities are to the same effect. As a partial list we cite: *Larsen v. Thuringia American Ins. Co.*, 208 Ill. 166, 70 N. E. 31; *Insurance Companies v. Raden*, 87 Ala. 311, 5 So. 876; *Wilson v. National Ben Franklin Fire Ins. Co.* (Mo. App.), 266 S. W. 338; *Yoshimi v. Fidelity Fire Ins. Co.*, 91 N. Y. S. 393; *Spann v. Commercial Standard Ins. Co. of Dallas, Tex.*, 82 F. 2d 593; *Conservative Life Insurance Co. v. Hutchinson*, 244 Ky. 746, 52 S. W. 2d 709; 32 C. J. 1254; 14 R. C. L. 1013.

For the same reason, what Rankin did respecting making claim under the Public Indemnity Company policies after plaintiff's injury would not amount to ratification, for at that time he had not been advised as to the true facts and necessarily was still acting under the influence of the fraud practiced on him by Herren. More than that, the liability to the plaintiff Riddle had accrued.

Respecting conclusion of law No. 7, there appears to be some lack of sound reasoning in holding that the insurer had the premiums all the time, but that the policies had been canceled by the insurer for nonpayment of premiums, and hence that the unearned premiums should be returned to Rankin. It is fair, however, to the trial court to point out that it held the insurer had no lawful right to cancel the policies for nonpayment of premiums; and yet that is the only reason it did so. We cannot concur in the trial court's conclusion that the policies were canceled by mutual consent. There was a lack of that fair understanding between the parties which normally accompanies mutual consent. The theory of appellee, heretofore stated, that the minds of the parties met on the cancellation of the policies, although they had different reasons therefor, under the facts of this case, is too finely drawn to be substantial. More than that, as we have seen, the consent Rankin gave to the matter was induced by the active fraud of the insurer's agent. In fairness and justice it cannot stand.

The result is that conclusions of law Nos. 5, 6 and 7 should be set aside and the judgment of the court below reversed, with directions to enter judgment for appellant. It is so ordered.